IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**RICK CORTEZ** and **TINA CORTEZ**,

      Plaintiffs,

vs.                          No. **CIV 02-1458 MCA/WDS**

**JOHN McCAULEY, JAMES GONZALES,
CURTIS SANCHEZ, SHUREKE COVINGTON,**
and **JOE BOWDICH**, in their individual capacities,
the **BOARD OF COMMISSIONERS OF THE
COUNTY OF BERNALILLO, NEW MEXICO,**
and **RAQUEL VILLEGAS**,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendants' Motion for Partial Summary Judgment Based on Qualified Immunity* [Doc. No. 24] filed on April 17, 2003, *Plaintiff's Motion to Reconsider Order Staying Discovery* [Doc. No. 55] filed on June 30, 2003, *Plaintiff Tina Cortez' Motion for Partial Summary Judgment Against Defendants McCauley, Gonzales, Sanchez, and Covington* [Doc. No. 60] filed on November 24, 2003, *Plaintiff Rick Cortez' Motion for Partial Summary Judgment Against Defendants McCauley, Gonzales, Sanchez, and Covington* [Doc. No. 62] filed on November 26, 2003, and the County Defendants' *Motion to Vacate Trial Setting and Pretrial Deadlines* [Doc. No. 76] filed on March 16, 2004.  Having reviewed the parties' submissions, the relevant

law, and otherwise being fully advised in the premises, the Court denies the parties' summary-judgment motions, grants Plaintiffs' motion to reconsider the order staying discovery, and grants the County Defendants' motion to vacate the trial setting and pretrial deadlines for the reasons set forth below.

## I.    BACKGROUND

This action arises from the conduct of certain employees of the Bernalillo County Sheriff's Department in response to a report of suspected child abuse made by Defendant Raquel Villegas. Counts I, II, and III of Plaintiffs' *First Amended Complaint for Civil Rights Violations, Tort Claims, and Damages* [Doc. No. 18] allege that in the early morning hours of May 26, 2001, Defendants John McCauley, James Gonzales, Curtis Sanchez, and Shureke Covington, acting in their capacity as law enforcement officers employed by the Bernalillo County Sheriff's Department, entered the property of Plaintiffs Rick Cortez and Tina Cortez without a warrant and subjected them to an unlawful arrest, search, interrogation, and use of excessive force in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Count V of the *First Amended Complaint* alleges that these individual Defendants also intentionally assaulted, battered, falsely arrested, and falsely imprisoned Plaintiffs and trespassed on their property in violation of the laws of the State of New Mexico. Count IV of the *First Amended Complaint* alleges theories of municipal liability and supervisory liability under 42 U.S.C. § 1983 against Defendants Joe Bowdich and the Board of County Commissioners, and Count VI alleges theories of negligence and

*respondeat superior* against these two Defendants.   Count VII of the *First Amended Complaint* asserts tort claims under state law against Defendant Villegas.

On April 17, 2003, Defendants McCauley, Gonzales, Sanchez, Covington, and Bowdich moved for summary judgment on grounds of qualified immunity as to Plaintiffs' federal civil-rights claims against them in their individual capacities. [Doc. No. 24.]  On May 5, 2003, Defendants McCauley, Gonzales, Sanchez, Covington, Bowdich and the Board of County Commissioners (collectively "the County Defendants") also moved to stay discovery pending the outcome of their motion for summary judgment on the issue of qualified immunity. [Doc. No. 30.]  The stay of discovery was granted on June 24, 2003, with the condition that Plaintiffs' request for limited discovery pursuant to their affidavit under Fed. R. Civ. P. 56(f) would be addressed separately. [Doc. No. 52.]  Plaintiffs moved for reconsideration of the order staying discovery on June 30, 2003 [Doc. No. 55], and later filed their own motions for partial summary judgment as to their federal civil-rights claims and state-law tort claims against Defendants McCauley, Gonzales, Sanchez, and Covington in their individual capacities. [Doc. No. 60, 62.]

As further discovery in this matter has been stayed, the evidence submitted for the Court's consideration during the course of the briefing on the parties' summary-judgment motions is limited to a small number of records from the Bernalillo County Sheriff's Department and affidavits by Plaintiffs and Defendant McCauley.  Based on this limited evidence and the parties' admissions in their pleadings, the facts relevant to the parties' summary-judgment motions can be summarized as follows.

At approximately 12:24 a.m. on May 26, 2001, the Bernalillo County Sheriff's Department received a report from Defendant Villegas that her two year-old daughter told her that her babysitter's boyfriend (Plaintiff Rick Cortez) had "hurt her pee-pee."  In response to this report, Defendants McCauley, Gonzales, Sanchez, and Covington were dispatched to Plaintiffs' residence in Bernalillo County, New Mexico.  Other officers were dispatched to interview Defendant Villegas at the hospital where she took the child for an examination.  [Ex. A to Doc. No. 25; McCauley Aff. 4-2-03.]

Police reports indicate that Officer J. J. Zuniga was dispatched to the hospital at approximately 12:37 a.m. on May 26, 2004 [Ex. 3 to Doc. No. 33], and that Detective Foster arrived at the hospital at approximately 1:05 a.m. that morning.  [McCauley Aff. 5-19-03; Ex. A to Doc. No. 25.]  Meanwhile, Defendants Gonzales, Sanchez, and Covington arrived at Plaintiffs' residence sometime between 12:41 a.m. and 12:45 a.m. on the morning of May 26, 2001.  [Ex. A to Doc. No. 25.]  Defendant McCauley arrived at Plaintiffs' residence shortly thereafter.  [McCauley Aff. 4-2-03.]  According to Defendant McCauley, the officers did not wait for the results of the examination of the child at the hospital before making contact with Plaintiffs at their residence.  [McCauley Aff. 5-19-03.]

Plaintiff Rick Cortez alleges that the officers arrived at his residence between approximately 12:30 a.m. and 1:00 a.m. on May 26, 2001. He states that he was awakened at that time by noise in his back yard, and that upon awakening he saw flashlights moving around in his back yard.  He then heard a knock at his front door.  [R. Cortez Aff. 5-2-03.]

The front doorway of Plaintiffs' residence contains both a solid interior door and an iron screen door.  Upon opening the solid interior front door and looking through the iron screen door, Plaintiff Rick Cortez saw two police officers on his front porch.  He believed there were additional officers at his residence because of the sounds and flashlights he perceived to be coming from his back yard.  He claims that he asked the officers what was going on, but they did not respond to his questions.  Instead, they demanded that he come outside.  Feeling that he had no choice but to obey the officers' orders, Plaintiff Rick Cortez opened the screen door and, upon doing so, was grabbed and pulled out of the house by one of the officers.  [R. Cortez Aff. 5-2-03.]

A police report indicates that Defendant Covington was one of the officers who went to the front door of Plaintiffs' residence and knocked.   According to the police report, Defendant Covington asked Plaintiff Rick Cortez to exit the residence and then handcuffed him, advised him of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and placed him in the back of a sheriff's department patrol vehicle.  [Ex. 3 to Doc. No. 33.]

Plaintiff Tina Cortez was awakened when her husband, Plaintiff Rick Cortez, got out of bed between approximately 12:30 a.m. and 1:00 a.m. on May 26, 2001.  She saw her husband go to the front door and get handcuffed and placed in a police car.  When she went to the bedroom to get the telephone, a police officer followed her into her residence without her permission.  Using a flashlight to illuminate the room, the officer walked into Plaintiffs' residence, took Plaintiff Tina Cortez by the arm, and physically escorted her out of the

residence.  She was then placed in the back seat of a police car and questioned by another officer.  [T. Cortez Aff. 5-2-03.]

Plaintiff Rick Cortez also was questioned while in the back seat of a sheriff's department patrol vehicle.  A police report indicates that during the questioning of Plaintiffs, Plaintiff Tina Cortez acknowledged that she did take care of several children during the day, and Plaintiff Rick Cortez informed Defendant Covington that there had been a verbal dispute with Defendant Villegas, in which Defendant Villegas "smarted off" to Plaintiff Tina Cortez and told both Plaintiffs to "f— off" before leaving with her child.  [Ex. 3 to Doc No. 33.]

Plaintiff Rick Cortez also claims that he told the officer in the car that his handcuffs were too tight and were hurting him.  The officer took no action to loosen the handcuffs.  Both Plaintiffs also claim that the officer seized the keys to their residence, locked the door, and would not let them go inside the residence.  Plaintiffs claim that they were detained against their will in this manner for approximately one hour, after which they were released and allowed to return to their residence.  Plaintiff Rick Cortez claims that he had red marks on both of his wrists for several days after this incident as a result of the handcuffs in which he was placed.  [R. Cortez Aff. 5-2-03; T. Cortez Aff. 5-2-03.]

As the above events were unfolding at Plaintiffs' residence, Officer Zuniga and Detective Foster made contact with Defendant Villegas and a nurse at the hospital's "Sane Unit."  Defendant Villegas gave the following unsworn written statement to one of the officers at the hospital:

about three or four weeks ago my daughter would come home once in awhile from the babysitter's house and complain that her "pee-pee hurts." I never asked anymore questions. On Tuesday, 5/22/01 I told the babysitter that she has been telling me her pee-pee hurts and the babysitter's husband was there. They said it could be the play sand. Tina told me they had it for about a week and I told her she's been complaining longer than that. On Friday 5/25 I went to go pick up my daughter and Tina said she needed to talk to me. She said that I made her feel bad because I deducted from her pay this week (I took off $25 because she took off a day, which I always do.) So I said well, it was because of Thursday she took off. She then said that she felt she was worth more and that from today on out she couldn't watch my daughter any longer. So I started saying I pay her and keep my daughter there the same as her sister. She then said will I please stop interrupting and then her husband interrupted and said I have no respect and I teach my daughter the same thing. This made me very angry because I had never disrespected them. So I told him off and left. When I was home I was crying and my daughter asked me if I was O.K., and I said yes that "Rick hurt my feelings." So I asked her has he ever hurt you and she said "mmhmm" (yes) and I asked her how and she said "Rick hurts my pee-pee." I didn't ask her anymore from there. Then when I was in the doctor's room waiting for him, we had just took off her pants so he could check her and she was screaming. When he left I said "What's wrong?" She said she scared to be naked and I asked why she does anyone hurt you she said yes Rick.

[Ex. 3 to Doc. No. 33.]

The nurse who conducted the examination at the hospital on May 26, 2001, advised Detective Foster that "no evidence of penile penetration was present" but the child "did have urine stained underwear on, which could irritate her vagina." The "bubble bath" used by Defendant Villegas also was identified as a potential source of irritation to the child's vagina. A follow-up examination was scheduled for May 29, 2001, but Detective Foster decided not to schedule a "safehouse interview" of the child because Defendant Villegas advised him that the child "just started talking and did not talk well." [Ex. 3 to Doc No. 33.]

Defendants Covington, Sanchez, and McCauley remained at Plaintiffs' residence while Officer Zuniga and Detective Foster made contact with Defendant Villegas and the nurse at the hospital. After speaking with Detective Foster, Defendant McCauley decided to release Plaintiffs from detention and allow them to return to their residence. [McCauley Aff. 5-19-03.] The dispatch report for this incident ends sometime between 1:49 a.m. and 2:16 a.m. on May 26, 2001. [Ex. A to Doc. No. 25.] Police records indicate that no evidence of criminal activity was discovered during the investigation after that date, and Plaintiffs were never charged with any crime. [Ex. 3 to Doc. No. 33.] The County Defendants later admitted in their statement of undisputed facts that: "The hospital did not find any evidence of molestation on May 26, 2001." [Doc. No. 25, ¶ 5, at 3.]

## II.   ANALYSIS

### A.   Standard of Review

Summary judgment under Fed. R. Civ. P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed. R. Civ. P. 56(e). Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Id. Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element

of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671-72 (10th Cir. 1998).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324. Thus, the Court only considers affidavits that set forth facts "based on personal knowledge" which "would be admissible in evidence; conclusory and self-serving affidavits are not sufficient" to defeat or support a motion for summary judgment.  Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991).  Similarly, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion.  Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995).  The Court may, however, consider admissions by a party opponent, see Fed. R. Evid. 801(d)(2), statements admissible for the limited purpose of showing their effect on the listener, see Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993), statements which constitute verbal acts or operative facts because legal consequences flow from their utterance, see Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th Cir. 2001), and other statements which fall under an exception to the hearsay rule, see, e.g., Fed. R. Evid. 803(3) (allowing for consideration of statements as circumstantial proof of the knowledge, intent, or state of mind of the declarant).

-9-

Apart from these limitations imposed by the Federal Rules of Evidence, it is not the court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

The same standards apply when parties file cross-motions for summary judgment or motions for partial summary judgment. See Lenning v. Commercial Union Ins. Co., 260 F.3d 574, 581 (6th Cir. 2001) (cross-motions); Boyd v. Cinmar of Gloucester, Inc., 919 F. Supp. 208, 208-09 (E.D. Va. 1996) (motions for partial summary judgment). Each motion is evaluated on its own merits, and a cross-motion should be treated separately from a response to an opposing party's motion. See Administrative Order 92-88 (Separate Submissions and Docketing of Motions and Responsive Pleadings) (D.N.M. May 4, 1992). Thus, the filing of cross-motions does not necessarily mean that the matter can be resolved by a summary judgment, nor does the denial of one party's cross-motion necessarily mean that the other party's cross-motion will be granted. See Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000).

When an individual defendant raises the affirmative defense of qualified immunity in a summary-judgment motion, the burden shifts to the plaintiff to establish that the defendant's actions violated a constitutional or statutory right and that the right at issue was

clearly established at the time of the defendant's unlawful conduct.  See Medina v. Cram, 252 F.3d 1124, 1128-29 (10th Cir. 2001); Gross v. Pirtle, 245 F.3d 1151, 1155-56 (10th Cir. 2001).  If the plaintiff fails to meet this burden, then the Court must grant the defendant qualified immunity.  See Gross, 245 F.3d at 1156.  If the plaintiff does establish the violation of a clearly-established constitutional or statutory right, then (for purposes of the defendant's summary-judgment motion) the burden shifts to the defendant to prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. See id.

### B.    Plaintiffs' Affidavit Under Fed. R. Civ. P. 56(f)

In response to the individual County Defendants' motion for partial summary judgment, Plaintiffs have filed an affidavit pursuant to Fed. R. Civ. P. 56(f) requesting that the Court deny or defer ruling on that motion based on their assertion that they cannot present all of the facts essential to justify their opposition at this time.  The Court determines that this request is moot with respect to Defendants McCauley, Gonzales, Sanchez, and Covington because, as discussed in Section II.C below, these individual County Defendants are not entitled to summary judgment based on the existing evidence submitted with the parties' briefs.

With respect to the other County Defendants, the Court concludes that Plaintiffs have made a meritorious showing under Fed. R. Civ. P. 56(f), and consequently these Defendants' motion for partial summary judgment is denied without prejudice pending further discovery.

More specifically, the Court determines that Plaintiffs have met the requirements of Fed. R. Civ. P. 56(f) by providing (1) a description of the particular discovery that they intend to seek, (2) an explanation showing how that discovery would preclude the entry of summary judgment, and (3) a statement justifying why this discovery had not been or could not have been obtained earlier.  See Price ex rel. Price v. Western Resources, Inc., 232 F.3d 779, 783-84 (10th Cir. 2000).

Unlike Defendants McCauley, Gonzales, Sanchez, and Covington, there is no evidence that Defendant Bowdich or the Bernalillo County Commissioners were present at the scene of Plaintiffs' arrest on May 26, 2001.  Consequently, Plaintiffs' claims against the latter group of Defendants rely on theories of municipal liability and/or supervisory liability. Evidence necessary to establish liability under these theories is not readily available in the police reports regarding the incident, nor can Plaintiffs reasonably be expected to rely on their own personal knowledge with respect to the kind of evidence that is relevant to these theories.  Further, discovery has been stayed pending a ruling on the other individual County Defendants' claims of qualified immunity, thereby precluding Plaintiffs from conducting the necessary discovery until after that stay is lifted.  For these reasons, the County Defendants' motion for partial summary judgment is denied in part with respect to Defendants Bowdich and the Bernalillo County Board of Commissioners pursuant to  Fed. R. Civ. P. 56(f).

### C.    Plaintiffs' Federal Civil-Rights Claims

The Court next addresses Plaintiffs' federal civil-rights claims against Defendants McCauley, Gonzales, Sanchez, and Covington in their individual capacities.  A ruling on

these claims is particularly important at this stage of the litigation because, as noted above, discovery has been stayed pending a determination of whether the individual County Defendants are entitled to qualified immunity under 42 U.S.C. § 1983.  The Court now determines that these Defendants are not entitled to summary judgment on qualified immunity grounds.

42 U.S.C. § 1983 provides, in relevant part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Persons sued in their individual capacity under this federal civil-rights statute generally are entitled to qualified immunity unless it is shown that their actions violated a specific statutory or constitutional right and that the rights which they allegedly violated were clearly established at the time of the conduct at issue.  See Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  But "officials can still be on notice that their conduct violates established law even in novel factual circumstances," particularly when an official's conduct amounts to "obvious cruelty." Hope v. Pelzer, 536 U.S. 730, 741, 745 (2002); see, e.g., Holland v. Harrington, 268 F.3d 1179,

1197 (10th Cir. 2001) (denying qualified immunity to SWAT deputies "for training a firearm directly on a four-year-old child").  The "salient question" is whether the state of the law at the time of the incident gave the defendants "fair warning" that their conduct was unconstitutional.  Hope, 536 U.S. at 741; accord Roska v. Peterson, 328 F.3d 1230, 1247-48 (10th Cir. 2003).

Because 42 U.S.C. § 1983 is not an independent source of substantive rights, but rather a mechanism for enforcing federal rights conferred elsewhere, the analysis of Plaintiffs' federal civil-rights claims necessarily begins by identifying the specific federal rights which the individual County Defendants are alleged to have violated.  See Graham v. Connor, 490 U.S. 386, 393-94 (1989); Reno v. Flores, 507 U.S. 292, 302 (1993); Dixon v. City of Lawton, 898 F.2d 1443, 1448 (10th Cir. 1990).  In this case, the constitutional right at issue is the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

When, as here, a defense of qualified immunity is raised in the context of the Fourth Amendment, the Court applies two distinct standards of reasonableness.  First, in determining whether a defendant's actions violated a specific right, the Court must decide whether the defendant conducted a search or seizure that was "unreasonable" under the Fourth Amendment.  Second, if such a violation is found, then in determining whether the constitutional right at issue was clearly established at the time of the search or seizure, the Court must answer the additional question of whether the contours of the right were "sufficiently clear that a reasonable official would understand that what he [did] violate[d]

-14-

that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987); accord Saucier v. Katz, 533 U.S. 194, 203-04 (2001).

The subjective intentions or state of mind of the Plaintiff or the individual County Defendants are not relevant to determining whether a seizure or its execution is objectively reasonable under the Fourth Amendment.  See Arkansas v. Sullivan, 532 U.S. 769, 771-72 (2001); United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996).   Rather, "the reasonableness of an officer's conduct must be assessed 'from the perspective of a reasonable officer on the scene,' recognizing the fact that the officer may be 'forced to make split-second judgments' under stressful and dangerous conditions."  Medina, 252 F.3d at 1131 (quoting Graham, 490 U.S. at 396-97).  This assessment must be "based upon the information the officers had when the conduct occurred."  Saucier, 533 U.S. at 207.

### 1.   Plaintiffs' Claims of Unlawful Search and Seizure

In this case, the County Defendants contend that Plaintiffs were lawfully subjected to an investigative detention that was supported by reasonable suspicion and concerns about officer safety, preventing the destruction of evidence, and ensuring the safety of any children that might have been present in Plaintiffs' residence at the time of the detention.  Plaintiffs contend that the County Defendants' conduct exceeded the permissible scope of an investigative detention and amounted to a full custodial arrest inside their residence.  Plaintiffs further contend  that their arrests are unlawful because they were not supported by probable cause, exigent circumstances, or a warrant.  In order to assess the validity of these contentions, the Court applies the well-established framework under which the Tenth Circuit

has divided interactions between police and citizens into three categories:  consensual encounters, investigative stops, and arrests.  See Oliver, 209 F.3d at 1186.

A consensual encounter occurs when a police officer simply approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and end the encounter.  For example, officers generally may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 Wayne R. LaFave, Search and Seizure:  A Treatise on the Fourth Amendment §2.3(b), at 475 (3d ed. 1996).  Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing," Oliver, 209 F.3d at 1186.  Thus, as a general rule, there is nothing improper about seeking to interview a possible suspect at his residence after receiving a report concerning the possible sexual abuse of a child.

An encounter between a law-enforcement officer and a citizen is no longer consensual when there has been a show of official authority that would cause a reasonable person to believe he or she is not free to leave.  See Florida v. Royer, 460 U.S. 491, 502 (1983) (plurality opinion); accord United States v. Maez, 872 F.2d 1444, 1450 (10th  Cir. 1989).

> Courts have identified several factors that could lead a reasonable innocent person to believe that he is not free to disregard the police officer, including: the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is

> compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

Sanchez, 89 F.3d at 718.  Similarly, an encounter at a person's residence is no longer consensual if the officer persists in the encounter after the homeowner directs him or her to leave or otherwise indicates that the officer is not permitted on the homeowner's property. See Rogers v. Pendleton, 249 F.3d 279, 288-90 (4th Cir. 2001).

With respect to their treatment of Plaintiffs in this case, the individual County Defendants' conduct quickly exceeded the scope of such a consensual encounter.  The evidence of record indicates that Plaintiff Rick Cortez was handcuffed after opening the front door to his residence and that Plaintiff Tina Cortez was then physically escorted from her residence and placed in the back seat of a sheriff's department patrol vehicle.  The evidence presented by Plaintiffs further indicates that their residence was surrounded by several officers, that they were ordered (not asked) to leave the residence, that their keys to the residence were confiscated, and that they did not give any of the County Defendants permission to enter the residence.

It is clearly established that a reasonable person who is "handcuffed and strapped into an officer's car . . . would not have felt free to terminate the encounter and leave."  United States v. Melendez-Garcia, 28 F.3d 1046, 1053 (10th Cir. 1994).  Thus, the incident in question is not accurately characterized as a consensual encounter.  To the extent that the individual County Defendants mistakenly believed they were involved in a consensual

-17-

encounter, such a mistake was not reasonable and does not entitle them to qualified immunity.

The County Defendants contend that their treatment of Plaintiffs can be justified on alternative grounds as an investigative detention.  An investigative detention occurs when an officer stops and briefly detains a person "'in order to determine his identity or to maintain the status quo momentarily while obtaining more information.'"  Oliver, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).   Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements in order to be considered "reasonable" under the Fourth Amendment.  First, the officer "'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'"  Id. (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).   Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out" in this context, United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001) (en banc).

When the evidence of record in this case is viewed in the light most favorable to Defendants, the report of possible sexual abuse of a child received from Defendant Villegas may have provided a particularized and objective basis for the County Defendants to suspect Plaintiff Rick Cortez of criminal activity until that suspicion was dispelled by the information provided at the hospital which indicated that no molestation had occurred.  Viewing the

evidence of record in the light most favorable to Defendants, the officers' suspicion during this brief period may have justified an investigative detention in order to maintain the status quo momentarily while obtaining more information.

An investigative detention based on reasonable suspicion does not necessarily preclude the use of certain security measures when there are objective, reasonable concerns about officer safety.  See, e.g., Holt, 264 F.3d at 1223 (concluding that in light of an officer's "objective, reasonable basis to fear for his or her life every time a motorist is stopped," officers conducting routine traffic stops may order the driver and passengers to get out of the vehicle and to raise their hands during the stop); United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993) (concluding that it was not unreasonable under the circumstances for officers to execute an investigatory stop by drawing their weapons and ordering the defendant out of his car and onto the ground); Gallegos v. City of Colorado Springs, 114 F.3d 1024, 1030-31 (10th Cir. 1997) (concluding that it was not unreasonable under the circumstances for an officer to execute an investigatory stop by grabbing a suspect by the arm and placing him face down on the pavement).  Thus, the fact that some degree of force is used during an investigative detention does not necessarily mean that the detention has become a full custodial arrest.

The general rule, however, is that "the use of firearms, handcuffs, and other forceful techniques" does not fall within the limited scope of an investigative detention based on reasonable suspicion.  Melendez-Garcia, 28 F.3d at 1052; accord Royer, 460 U.S. at 499. And when the evidence of record in this case is viewed in the light most favorable to

-19-

Plaintiffs, it is reasonable to infer that the scope and duration of a lawful investigative detention was quickly exceeded in this case, and the situation became a full custodial arrest.

The County Defendants cannot avoid such an inference simply by alleging in a generic and conclusory manner that they had "officer safety concerns" and wanted to preserve potential evidence.  Such conclusory allegations may not be considered as admissible evidence in ruling on a motion for summary judgment in this context.  See Hall, 935 F.2d at 1111.  In order to show that the forceful techniques allegedly used here fit into the limited scope of an investigative detention, the County Defendants must specify what prompted their concerns and identify the particular evidence on which they based those concerns.  They have not done so in this case.

In particular, the County Defendants have not articulated any specific facts that led them to believe Plaintiffs presented a threat to anyone's safety at the time of the arrest or were about to destroy evidence of a crime.  There is no evidence in the record to support a reasonable and particularized suspicion that Plaintiffs were armed, that the residence contained any specific type of physical evidence of sexual abuse that was about to be destroyed, or that other persons besides Plaintiffs were in the residence at the time of the incident.

Further, the County Defendants have presented no legal authority that justifies extending the security measures typically employed in vehicle stops to the context of ordering a person out of his or her residence.  The Supreme Court has long recognized that a person has a greater expectation of privacy in his home than in his vehicle.  Compare

-20-

Payton v. New York, 445 U.S. 573, 585-89 (1980), with California v. Carney, 471 U.S. 386, 390-93 (1985).  In addition, the jurisprudence of the Tenth Circuit "has long recognized that a person's privacy interest is at its highest in a person's home."  Roska, 328 F.3d at 1248.  "Consistent with these principles," the Tenth Circuit also has "held that police officers could not enter a house to investigate potential child abuse without a warrant."  Id. at 1249.  For these reasons, the evidence of record viewed in the light most favorable to Plaintiffs supports a reasonable inference that the individual County Defendants exceeded the permissible scope of an investigative detention and performed a full custodial arrest.

An arrest is a seizure that is "'characterized by highly intrusive or lengthy search or detention.'"  Oliver, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).  Inasmuch as an arrest exceeds the limited scope or duration of an investigative stop, the Fourth Amendment requires that it be supported by probable cause.  See United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001); United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998).  Under the Fourth Amendment, "the standard of probable cause 'applie[s] to all arrests, without the need to "balance" the interests and circumstances involved in particular situations.'"  Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) (quoting Dunaway v. New York, 442 U.S. 200, 208 (1979)).

"'Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.'"  Oliver, 209 F.3d at 1186 (quoting Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir.

1995)).  While a determination of probable cause is to be based upon the totality of the circumstances, questions regarding the veracity, reliability, and basis of knowledge of witnesses remain "highly relevant."  Illinois v. Gates, 462 U.S. 213, 230 (1983).

The veracity of crime victims, or crime-scene bystanders, ordinarily is assumed in making determinations of reasonable suspicion and probable cause.  See United States v. Blount, 123 F.3d 831, 835 (5th Cir. 1997) (en banc).  Nevertheless, police officers "may weigh the credibility of witnesses" and are not required to believe one witness's testimony over that of another in making such a determination.  Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998).

In this case, the County Defendants were relying on a hearsay report from a child's parent who had just recently engaged in a verbal dispute with Plaintiffs in the child's presence.  The County Defendants did not wait for the results of any physical examination or interview of the child by an objective observer before descending upon Plaintiffs' residence.  Under these circumstances, there is a genuine issue as to whether the information on which the County Defendants relied was "reasonably trustworthy" enough to establish probable cause.  See id. at 1259.

Another relevant consideration regarding the probable-cause inquiry is whether officers have made a reasonable effort to "'interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of a warrantless arrest and detention.'"  Id. at 1259 (quoting Romero, 45 F.3d at 1476-77).  In this case, Defendants had the opportunity to confirm or dispel some of

their suspicions about Plaintiff Rick Cortez within a short time after receiving the report from Defendant Villegas at the hospital. For example, they could have waited for a brief period to interview the nurse who was examining the child, or conducted a more detailed interview of the child's mother, before proceeding to arrest Plaintiffs at their residence. Viewing the evidence in the light most favorable to Plaintiffs, there is a genuine issue of material fact as to whether the County Defendants had probable cause to arrest Plaintiffs or search their residence at the time of the incident.

Further, the requirement of probable cause was clearly established on or about May 26, 2001. See Royer, 460 U.S. at 502; Dunaway, 442 U.S. at 211-16, Gonzalez, 763 F.2d at 1133. A reasonable officer under the circumstances would not have mistakenly believed that probable cause existed when the evidence is viewed in the light most favorable to Plaintiffs. See Baptiste, 147 F.3d at 1259-60. Accordingly, the individual County Defendants are not entitled to qualified immunity on this issue.

There is also a genuine issue of material fact as to whether the County Defendants' arrest of Plaintiffs was effectively conducted inside their residence. It is well established that "'searches and seizures inside a home without a warrant are presumptively unreasonable'" under the Fourth Amendment. United States v. Cuaron, 700 F. 2d 582, 586 (10th Cir. 1983) (quoting Payton, 445 U.S. at 586); accord Roska, 328 F.3d at 1240. In this case, it is undisputed that the County Defendants did not have a warrant when they detained Plaintiffs and entered their residence.

The County Defendants rely on <u>Illinois v. McArthur</u>, 531 U.S. 326 (2001), to support their position that they were entitled to detain Plaintiffs without a warrant and prevent them from returning to their residence while the investigation of Defendant Villegas's report of suspected child abuse was underway.  The <u>McArthur</u> opinion states that "a person standing in the doorway of a house is 'in a "public" place,' and hence subject to arrest without a warrant permitting entry of the home."  <u>Id.</u> at 335 (quoting <u>United States v. Santana</u>, 427 U.S. 38, 42 (1976)); <u>accord</u> <u>McKinnon v. Carr</u>, 103 F.3d 934, 935 (10th Cir. 1996).

When viewed in the light most favorable to Plaintiffs, however, the evidence of record in this case does not indicate that Plaintiffs were standing in the doorway of their house at the time of their arrest.  Rather, the evidence of record supports a reasonable inference that Plaintiffs remained inside their residence until they were coerced into exiting the residence by the forceful actions of the individual County Defendants.

When a person's exit from his or her residence is caused by coercion, the seizure of his person may be subject to the same requirements that apply to an in-home arrest.  <u>See</u> <u>United States v. Flowers</u>, 336 F.3d 1222, 1226-28 (10th Cir. 2003); <u>Maez</u>, 872 F.2d at 1451 (collecting cases).  For example, the Tenth Circuit has found that the Fourth Amendment was violated when "a number of armed officers and a SWAT team, having no warrant for an arrest, surrounded a mobile home occupied by [the defendant], his wife and children, and over loudspeakers asked the occupants to remove themselves from the home, which they did." <u>Maez</u>, 872 F.2d at 1446.  In that situation, the Tenth Circuit reasoned that the show

of force that the Government used to coerce the suspect to exit his home effectively invaded the privacy of the home to the same extent as a physical intrusion.  See id. at 1451.

When the evidence of record is viewed in the light most favorable to Plaintiffs, the Court concludes that the events at Plaintiffs' residence are distinguishable from McArthur and are more analogous to the facts in Flowers and Maez.  This case bears more resemblance to Flowers and Maez because, according to Plaintiff Rick Cortez's affidavit, he was awakened in the middle of the night by noises and flashlights in his back yard in addition to hearing two officers knocking on the front door.  Further, Plaintiff Rick Cortez's affidavit indicates that he remained inside his residence with the iron screen door closed when the two officers on his front porch ordered him to come outside, and one or more of the County Defendants had physically entered the residence at the time they arrested Plaintiff Tina Cortez.  These facts support a reasonable inference that the County Defendants physically intruded in Plaintiffs' residence to arrest Plaintiff Tina Cortez, and that they effectively invaded the privacy of the residence to the same extent as a physical intrusion by using a show of force to coerce Plaintiff Rick Cortez to come outside during the middle of the night.

When viewed in the light most favorable to Plaintiffs, the evidence of record in this case is also distinguishable from McArthur in other respects.   Unlike this case, the suspect in McArthur did not dispute that the police had probable cause to believe his home contained evidence of a crime (namely unlawful drugs).  See McArthur, 531 U.S. at 331-32.  Also unlike this case, the police did not arrest the suspect in McArthur while awaiting a warrant to search the residence.  Rather, they simply prevented him from entering his home

-25-

unaccompanied, thereby tailoring the restraint at issue to the particular law-enforcement needs at hand, and "avoiding significant intrusion into the home itself" until a warrant could be obtained.  Id. at 331-32.  The County Defendants have presented no evidence that they ever sought a warrant in this case.

McArthur also is distinguishable with respect to the presence of exigent circumstances.  In that case, the Supreme Court recognized an exception to the warrant requirement when the police have both probable cause and "a plausible claim of specially pressing or urgent law enforcement need, i.e., 'exigent circumstances.'" Id. at 331.  Exigent circumstances were present in McArthur because "the police had good reason to fear that, unless restrained, McArthur would destroy the drugs before they could return with a warrant."  Id. at 332.  More specifically, the suspect in McArthur was aware that his former spouse had reported the matter to police and that the police were waiting outside his residence.  Thus, the police "reasonably could have concluded that McArthur, consequently suspecting an imminent search would, if given the chance, get rid of the drugs fast."  Id.

"The notion that emergency circumstances may in appropriate cases make a warrantless search constitutional if probable cause exists is a clearly established exception to the warrant requirement."  United States v. Aquino, 836 F.2d 1268, 1270-71 (10th Cir. 1988); accord Cuaron, 700 F.2d at 586.  In addition to circumstances like McArthur where the destruction of particular evidence is imminent, the Tenth Circuit has applied this exception to "'hot pursuit of a fleeing felon . . . or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling.'"  United

States v. Wicks, 995 F. 2d 964, 970 (10th Cir. 1993) (quoting Minnesota v. Olson, 495 U.S.

91, 100 (1990) (citations omitted)).   The Tenth Circuit also has stated that exigent

circumstances exist when:

> (1) the law enforcement officers . . . have reasonable grounds to believe that
> there is immediate need to protect their lives or others or their property or that
> of others, (2) the search [is not] motivated by an intent to arrest and seize
> evidence, and (3) there [is] some reasonable basis, approaching probable
> cause, to associate an emergency with the area or place to be searched.

United States v. Anderson, 981 F.2d 1560, 1567 (10th Cir. 1992) (alterations in original),

quoted with approval in Roska, 328 F.3d at 1240.

When viewed in the light most favorable to Plaintiffs, the evidence of record in this

case does not support a reasonable inference that any of the types of exigent circumstances

described above were present in the early morning hours of May 26, 2001.  There is no

particularized and objective basis for concluding that there was any imminent danger to

persons inside or outside the residence, or that any evidence in the residence was about to

be destroyed, or that any suspect was about to flee or escape.  Under these circumstances,

the Court cannot premise a finding of exigency on mere speculation or surmise about what

could possibly happen if the police did not take immediate action.

At the time they arrested Plaintiffs and entered the residence, the record indicates that

the information available to the County Defendants stationed at that location consisted of

Defendant Villegas's report that her two-year old child had told her that her babysitter's

boyfriend (Plaintiff Rick Cortez) had "hurt her pee-pee."  [Ex. A to Doc No. 25.]  This

information provided no particularized reason to believe that other children remained in the

-27-

residence at that time or that Plaintiffs had any reason to suspect the alleged abuse had been reported to the authorities.  Defendant Villegas's report also did not identify with any specificity what type of physical evidence of abuse might be found at the residence or what particular characteristics of Plaintiffs made them a threat to the officers.

Rather than relying on such specific and particularized concerns, the County Defendants assert in their reply brief that "there exists an inherent exigency when law enforcement receives a report of child molestation."  [Doc No. 43, at 6.]   To support this proposition, the County Defendants cite New Mexico statutes concerning the mandatory reporting and investigation of suspected child abuse.  See N.M. Stat. Ann. §§ 30-6-4, 32A-4-3 (Michie 1978 & Supp. 1999).

In reviewing New Mexico's Children's Code and related criminal statutes, the Court acknowledges that "[a]nyone reporting an instance of alleged child neglect or abuse . . . is presumed to be acting in good faith and shall be immune from liability, civil or criminal, that might otherwise be incurred or imposed by the law, unless the person acted in bad faith or with malicious purpose."  N.M. Stat. Ann. § 32A-4-5(B) (Michie 1978 & Supp. 1999).  In requiring prompt investigation of such reports by law enforcement officers, however, the laws of the State of New Mexico do not exempt the County Defendants from the constitutional requirements of probable cause and a particularized showing of exigent circumstances to conduct a warrantless search and seizure inside a person's residence during the middle of the night.  In other words, the County Defendants cannot rely solely on the grave nature of the alleged offense (i.e., sexual abuse of a two year-old child) to support a

finding of probable cause or exigent circumstances.  See Roska, 328 F.3d at 1242; Franz v. Lytle, 997 F.2d 784, 793 (10th Cir. 1993).

When viewed in the light most favorable to Plaintiffs, the evidence of record does not contain the specific and particularized facts necessary to support a finding that probable cause or exigent circumstances were present in this case.  Accordingly, the factfinder could reasonably infer that the individual County Defendants who were present at Plaintiffs' residence during the early hours of May 26, 2001, violated Plaintiffs' Fourth Amendment rights by arresting them and entering their residence without a warrant, probable cause, or exigent circumstances.

The Court also concludes that the contours of Plaintiffs' Fourth Amendment rights were clearly established in this context on May 26, 2001.  The Tenth Circuit has held as early as 1993 that the requirements of probable cause and exigent circumstances apply to a law enforcement officer's warrantless search and seizure inside an individual's residence during the course of a child sexual abuse investigation.  See Franz, 997 F.2d at 793.  More recently, the Tenth Circuit has declined to extend qualified immunity to social workers in this context "absent something approaching probable cause to believe that:  (1) the child's health or safety was at risk, and (2) this risk was due to the child's presence in the home." Roska, 328 F.3d at 1250.  Further, the Supreme Court has recently observed that "officials can still be on notice that their conduct violates established law even in novel factual circumstances," so long as the state of the law at the time of the incident gave them "fair warning" that their conduct was unconstitutional   Hope, 536 U.S. at 741.

In contrast to the facts of <u>Roska</u>, 328 F.3d at 1250, the individual County Defendants in this case did not have evidence that any children were present in Plaintiffs' residence at the time of the incident in question, much less that such children were in any imminent danger.  Thus, the alleged violation of Plaintiffs' Fourth Amendment rights approaches the level of obviousness found to exist in <u>Hope</u>, 536 U.S. at 745, where no case law directly on point is necessary to defeat qualified immunity.

For these reasons, Defendants McCauley, Gonzales, Sanchez, and Covington are not entitled to qualified immunity on Plaintiffs' unlawful search and seizure claims, and their motion for partial summary judgment on this issue is denied.  Plaintiffs' motions for partial summary judgment on this issue also are denied based on the presence of one or more genuine issues of material fact with respect to the limited evidence in the record at this preliminary stage of the litigation.

## 2. <u>Plaintiffs' Claims of Excessive Force</u>

The Court next turns to Plaintiffs' claims that the force used in effecting their arrest was excessive and unreasonable.  The standard of objective reasonableness described above also governs the degree of force which lawfully may be used to effectuate an arrest under the Fourth Amendment.  Factors which are relevant to the reasonableness of the force used to effect an arrest "include the crime's severity, the potential threat posed by the suspect to the officer and others' safety, and the suspect's attempts to resist or evade arrest."  <u>Saucier</u>, 533 U.S. at 207.

In the Tenth Circuit, a finding of excessive force in violation of the Fourth Amendment is not necessarily foreclosed by the fact that the plaintiff did not suffer a physical injury. See Holland, 268 F.3d at1195. "[T]he interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property, and privacy interests--a person's 'sense of security' and individual dignity." Id. Recognition of such interests is "clearly established," id. at 1197; see also id. at 1195 (citing Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971); Baker v. Monroe Township, 50 F.3d 1186 (3d Cir. 1995); and McDonald v. Haskins, 966 F.2d 292 (7th Cir. 1992)). Thus, the absence of any lasting physical injury (beyond the red marks on Plaintiff Rick Cortez's wrists) does not preclude Plaintiffs from asserting an excessive-force claim in this instance.

In support of their motion for summary judgment on Plaintiffs' excessive-force claim, the individual County Defendants correctly cite the proposition that the Fourth Amendment permits officers to use some degree of physical coercion or threat thereof to effectuate an otherwise lawful arrest. See Saucier, 533 U.S. at 208; Graham, 490 U.S. at 396; Gross, 245 F.3d at 1158. Further, as noted above, it is not necessarily unreasonable for officers to make a limited show of force, which may involve some degree of physical contact with a suspect, in the process of an investigative detention based on reasonable suspicion if objectively reasonable concerns about officer safety are present. See Holt, 264 F.3d at 1223; Perdue, 8 F.3d at 1463; Gallegos, 114 F.3d at 1030-31.

If there was no legal justification to detain Plaintiffs in the first place, however, then the County Defendants cannot rely on the above authorities to justify their use of force in effecting that detention.  See Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir. 1998); Sheth v. Webster, 145 F.3d 1231, 1238 (11th Cir. 1998).  As noted in the preceding discussion of Plaintiffs' unlawful search and seizure claims, the evidence of record viewed in the light most favorable to Plaintiffs supports a reasonable inference that their arrest on May 26, 2001, was unreasonable under the Fourth Amendment.  Thus, the detention itself does not necessarily justify the use of any force.

The evidence of record viewed in the light most favorable to Plaintiffs also reveals the absence of any significant attempt to resist or evade arrest.  The only evidence in the record which could be characterized as "resistance" is that Plaintiff Rick Cortez briefly asked the officers what was going on before complying with their commands to exit the residence, and that Plaintiff Tina Cortez  tried to make a telephone call from within her residence upon seeing that her husband had been arrested.  Absent lawful grounds for detaining Plaintiffs in the first place, these actions do not provide justification for grabbing Plaintiffs and placing them in the back of police cars.

Further, the County Defendants have not set forth an objective, particularized basis for suspecting that Plaintiffs posed a threat to the officers or others at the scene at the time of the arrest.  As noted above, the individual County Defendants' at the scene of the arrest have not presented any evidence to suggest that Plaintiffs were armed or that other persons besides Plaintiffs were present in the residence at the time they approached and took

Plaintiffs into custody.  Under these circumstances where there is no specific evidence to support a reasonable inference that Plaintiffs have immediate access to any children, the County Defendants cannot rely solely on the severity of the alleged crime (*i.e.*, sexual abuse of a child) to justify the use of force.

The law in this area was clearly established on May 26, 2001, see Holland, 268 F.3d at 1195, and to the extent that this case presents novel factual circumstances, the alleged violation was obvious enough to give the individual County Defendants "fair warning" that their use of force was excessive.  See Hope, 536 U.S. at 741, 745.  Further,  "Tenth Circuit precedent clearly established before June 18, 1992, that a law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983."  Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996) (collecting cases). Accordingly, Defendants McCauley, Gonzales, Sanchez, and Covington are not entitled to qualified immunity on Plaintiffs' excessive-force claims, and their motion for partial summary judgment on this issue is denied.

Plaintiffs' motions for partial summary judgment on their excessive-force claims are also denied based on the presence of one or more genuine issues of material fact with respect to the limited evidence in the record at this preliminary stage of the litigation.  The determination of the witnesses' credibility must be left to the factfinder at trial.  See Olsen v. Layton Hills Mall, 312 F.3d 1304, 1314-15 (10th Cir. 2002); Butler v. Norman, 992 F.2d 1053, 1055 (10th Cir. 1993).

D.     **Plaintiffs' Tort Claims Under State Law**

In addition to their federal civil-rights claims, Plaintiffs assert various tort claims under the law of the State of New Mexico.  Specifically, Count V of the *First Amended Complaint* alleges that Defendants McCauley, Gonzales, Sanchez, and Covington also intentionally assaulted, battered, falsely arrested, and falsely imprisoned Plaintiffs and trespassed on their property, and Count VI alleges theories of negligence and *respondeat superior* against Defendants Bowdich and the Board of County Commissioners.  The County Defendants assert that they are entitled to sovereign immunity with respect to these state-law claims under the New Mexico Tort Claims Act (NMTCA), N.M. Stat. Ann. §§ 41-4-1 to 41-4-29 (Michie 1978 & Supp. 2001).

Section 41-4-4(A) of the NMTCA grants governmental immunity from liability for any tort to governmental entities and public employees acting within the scope of their duties except as waived by Sections 41-4-5 to 41-4-12 of the NMTCA.  The waiver of immunity applicable to "law enforcement officers while acting within the scope of their duties" contained in Section 41-4-12 is limited to

> liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico.

Assault, battery, false arrest, and false arrest are among the torts enumerated in Section 41-4-12 of the NMTCA, and trespass constitutes a "violation of property rights" under this section.  Thus, the NMTCA does not preclude Plaintiff from proceeding on these claims.

-34-

While the NMTCA does not waive sovereign immunity for simple negligence of law enforcement officers, see Caillouette v. Hercules, Inc., 113 N.M. 492, 497, 827 P.2d 1306, 1311 (Ct. App. 1992), if one or more of the torts or civil-rights violations enumerated in Section 41-4-12 of the NMTCA were caused by the negligence of other law enforcement officers acting within the scope of their duties, immunity is waived for such negligence. See Methola v. County of Eddy, 95 N.M. 329, 333, 622 P.2d 234, 237 (1980); McDermitt v. Corrections Corp. of Am., 112 N.M. 247, 249, 814 P.2d 115, 117 (Ct. App. 1991). Thus, the NMTCA does not necessarily preclude a claim for negligent supervision and training against Defendants Bowdich or the Board of County Commissioners where that negligence results in an assault, battery, false arrest, false imprisonment, trespass, or Fourth Amendment violation by one or more subordinate officers.

Plaintiffs also may proceed on their *respondeat superior* claims. The elements required to establish a municipality's liability for state-law tort claims under a *respondeat superior* theory were clarified by the New Mexico Supreme Court in Weinstein v. City of Santa Fe, 1996-NMSC-021, 121 N.M. 646, 651-62, 916 P.2d 1313, 1318-19 (citing N.M. Stat. Ann. § 41-4-12). Under New Mexico law, a municipality may be held vicariously liable for any alleged torts committed by one of its police officers if immunity for those torts has been waived under the New Mexico Tort Claims Act and the police officer was acting within the scope of his authority. See id. at 651, 916 P.2d at 1318. In particular, the municipality must have supervisory authority over the police department and its officers, and

the municipality must not be "too remote an actor to be included as a defendant." Id. at 652, 916 P.2d at 1319.

The status of Plaintiffs' state-law claims in this case is largely determined by the Court's rulings on their federal civil-rights claims and their affidavit under Fed. R. Civ. P. 56(f). With respect to Plaintiffs' state-law claims against Defendants Bowdich and the Board of County Commissioners for *respondeat superior* liability and negligent supervision and training, the Court has determined pursuant to Fed. R. Civ. P. 56(f) that summary judgment is not warranted at this early stage of the litigation because Plaintiffs have not been given an adequate opportunity to conduct discovery with regard to these claims.

With respect to Plaintiffs' claims for assault, battery, false arrest, false imprisonment, and trespass, the Court determines that the parties' cross-motions for partial summary judgment must be denied because there are one or more genuine issues of material fact concerning the lawfulness of the individual County Defendant's conduct in arresting and detaining Plaintiffs and entering their residence. The Court briefly summarizes the elements and defenses with respect to each of these claims as follows.

### 1.     <u>Assault and Battery</u>

New Mexico does not have uniform civil jury instructions for the torts of assault or battery. <u>See</u> NMUJI 13-1624 cmt. (Michie 2003) (noting committee's conclusion that "there was insufficient New Mexico law on assault and battery to guide the committee on this subject"). Thus, the Court relies on published opinions of the State's appellate courts,

analogous statutory offenses, and relevant provisions of the Restatement (Second) of Torts to define the elements of these torts and any relevant defenses.

Under Sections 13 and 18 of the Restatement, an actor is subject to liability to another for battery if he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and a harmful or offensive contact with the person of the other directly or indirectly results. See Restatement (Second) of Torts §§ 13, 18 (1965). New Mexico's criminal statutes further define battery as "the unlawful, intentional touching or application of force to the person of another," N.M.Stat. Ann. § 30-3-4 (Michie 1978).

Under Section 21 of the Restatement,

> An actor is subject to liability to another for assault if
>
> (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and
>
> (b) the other is thereby put in such imminent apprehension.

Restatement (Second) of Torts, supra, § 21. New Mexico law further provides that "[a]n assault requires a 'threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery.'" Romero v. Sanchez, 119 N.M. 690, 693, 895 P.2d 212, 215 (1995) (quoting N.M. Stat. Ann. 30-3-1(B) (Michie 1994)); see also Baca v. Velez, 114 N.M. 13, 15, 833 P.2d 1194, 1196 (Ct. App. 1992).

A common element of assault and battery is an intent "'to engage in unlawful conduct that invades the protected interests of others.'" Caillouette, 113 N.M. at 496-97, 827 P.2d

at 1310-11 (quoting <u>California First Bank v. State of N.M.</u>, 111 N.M. 64, 74 n.6, 801 P.2d

646, 656 n.6 (1990)).  Thus, where a police officer's actions in detaining or arresting a

suspect are not otherwise unlawful, the officer is not subject to liability for the torts of

assault or battery.  <u>See</u> Restatement (Second) of Torts, <u>supra</u>, § 121.  Further, if the means

employed by the officer to effect an otherwise lawful arrest are in excess of those which he

is privileged to use, the officer is liable only for so much of the force as is excessive.  <u>See</u>

<u>id.</u> § 133.

### 2. <u>False Arrest and Imprisonment</u>

"Under New Mexico law, '[f]alse imprisonment consists of intentionally confining

or restraining another person without his consent and with knowledge that he has no lawful

authority to do so.'"  <u>Romero</u>, 119 N.M. at 693, 895 P.2d at 215 (quoting N.M. Stat. Ann.

§ 30-4-3 (Michie 1994)); <u>see also</u> <u>Mendoza v. K-Mart, Inc.</u>, 587 F.2d 1052, 1058 (10th Cir.

1978) ("One basic element of . . . a [false imprisonment] claim is that the plaintiff be

confined or restrained in some unlawful way by the defendant.").  Unlawful arrest or

detention has "similar requirements."  <u>Romero</u>, 119 N.M. at 693, 895 P.2d at 215.  "[A]

common-law defense to a civil wrongful arrest or a false imprisonment suit  . . . requires

only that the officer prove that he or she acted in good faith and with probable cause and

therefore lawfully under the circumstances."  <u>State v. Johnson</u>, 122 N.M. 696, 701-02, 930

P.2d 1148, 1153-54 (1996).

3. **Trespass**

A trespass on land "consists of an unauthorized entry upon the land of another" and can form the basis for liability under Section 41-4-12 of the NMTCA. <u>Montes v. Gallegos</u>, 812 F. Supp. 1165, 1170 (D.N.M. 1992) (citing <u>North v. Pub. Serv. Co.</u>, 94 N.M. 246, 608 P.2d 1128 (Ct. App. 1980)). In New Mexico, "[c]riminal trespass consists of unlawfully entering or remaining upon posted private property without possessing written permission from the owner or person in control of the land," or "unlawfully entering or remaining upon the unposted lands of another knowing that such consent to enter or remain is denied or withdrawn by the owner or occupant thereof." N.M. Stat. Ann. § 30-14-1(A) and (B) (Michie 1978 & Supp. 2001); <u>see also</u> <u>id.</u> § 30-14-1.1(A) ("Any person who enters and remains on the lands of another after having been requested to leave is guilty of a misdemeanor."); NMUJI 13-1301 (Michie 2002) (defining a "trespasser" as "a person who enters or remains upon the premises of another without the [express] [or] [implied] permission of the [owner] [occupant] of the premises") (brackets in original). A criminal trespasser "shall be liable to the owner, lessee or person in lawful possession for civil damages in an amount equal to double the value of the damage to the property injured or destroyed" by the trespasser. <u>Id.</u> § 30-14-1(D); <u>accord</u> <u>id.</u> § 30-14-1.1(D).

The tort of trespass also encompasses trespass to chattels. <u>See</u> <u>Restatement (Second) of Torts</u> § 217 (1965), <u>Texas-New Mexico Pipeline Co. v. Allstate Constr., Inc.</u>, 70 N.M. 15, 17, 369 P.2d 401, 402 (1962) ("Trespass to personalty is the intentional use or interference with a chattel which is in the possession of another, without justification."). "One who

commits a trespass to a chattel is subject to liability to the possessor of the chattel if . . . he dispossesses the other of the chattel," Restatement, supra § 218, and a "dispossession may be committed by [among other things] intentionally . . . taking the chattel into the custody of the law." Id. § 221(e).

In this case, Plaintiff has presented evidence which, when viewed in the light most favorable to them, could reasonably support a claim on each of the above elements of assault, battery, false arrest, false imprisonment, and trespass. There remain genuine issues of material fact, however, as to whether the County Defendants can establish affirmative defenses to these claims by showing that they acted in good faith and within their authority as law enforcement officers. Accordingly, the parties' cross-motions for partial summary judgment are denied with respect to these state-law claims.

### E.   Plaintiff's Motion to Reconsider Stay of Discovery

Pursuant to the *Order* entered on June 24, 2003, discovery in this matter was stayed "pending resolution of Defendants' motion for partial summary judgment." [Doc. No. 52.] When, as in this case, a defendant raises the defense of qualified immunity, a stay of discovery is generally warranted unless a sufficient showing to the contrary is made under Fed. R. Civ. P. 56(f).  See Behrens v. Pelletier, 516 U.S. 299, 308 (1996); Workman v. Jordan, 958 F.2d 332, 336 (10th Cir. 1992); Jones v. City & County of Denver, Colo., 854 F.2d 1206, 1210-11 (10th Cir. 1988).

The *Order* entered on June 24, 2003, did not address the affidavit that Plaintiffs filed pursuant to Fed. R. Civ. P. 56(f) in response to the County Defendants' summary-judgment

motion.  As stated in Section II.B of this *Memorandum Opinion and Order*, the Court now determines that Plaintiff's affidavit establishes good cause for denying the County Defendants' motion in part with respect to certain claims and allowing further discovery on those claims.  Further, the Court has resolved the County Defendants' motion for partial summary judgment on the issue of qualified immunity.  Thus, the defense of qualified immunity no longer provides justification for staying discovery, and Plaintiffs' affidavit under Fed. R. Civ. P. 56(f) provides grounds for allowing further discovery.

For these reasons, Plaintiffs' *Plaintiff's Motion to Reconsider Order Staying Discovery* [Doc. No. 55] is granted.  The stay of discovery pursuant to the *Order* filed on June 24, 2003, [Doc. No. 52] is no longer in effect.

### F.   Motion to Vacate Trial Setting

The jury selection and trial in this case is currently scheduled to commence on May 11, 2004, with a pretrial conference scheduled on April 6, 2004.  [Doc. No. 75.]  On March 16, 2004, the County Defendants moved to vacate this trial setting and the other pretrial deadlines based on the issue of qualified immunity asserted in their summary-judgment motion.  [Doc. No. 76.]  While the issue of qualified immunity no longer provides a basis for staying further proceedings in this matter, the Court determines that good cause exists for vacating the current trial setting and pretrial deadlines based on the fact that the parties have not been afforded a sufficient opportunity to complete discovery prior to the current trial date and the expiration of the current pretrial deadlines.  On this alternative basis, the County Defendants' motion to vacate the trial setting and pretrial deadlines is granted.

The issue of rescheduling new pretrial deadlines for the completion of discovery and the filing of dispositive motions is referred to United States Magistrate Judge W. Daniel Schneider.  The Court will reschedule the trial date at a later time once those pretrial deadlines are established.

**III.**   **CONCLUSION**

For the foregoing reasons, the parties' cross-motions for partial summary judgment are denied, Plaintiffs' motion to reconsider the order staying discovery is granted, and the County Defendants' motion to vacate the trial setting and pretrial deadlines is granted.

**IT IS, THEREFORE, ORDERED** that *Defendants' Motion for Partial Summary Judgment Based on Qualified Immunity* [Doc. No. 24] is **DENIED**.

**IT IS FURTHER ORDERED** that *Plaintiff's Motion to Reconsider Order Staying Discovery* [Doc. No. 55] is **GRANTED** under the conditions stated herein.

**IT IS FURTHER ORDERED** that *Plaintiff Tina Cortez' Motion for Partial Summary Judgment Against Defendants McCauley, Gonzales, Sanchez, and Covington* [Doc. No. 60] is **DENIED**.

**IT IS FURTHER ORDERED** that *Plaintiff Rick Cortez' Motion for Partial Summary Judgment Against Defendants McCauley, Gonzales, Sanchez, and Covington* [Doc. No. 62] is **DENIED**.

**IT IS FURTHER ORDERED** that the County Defendants' *Motion to Vacate Trial Setting and Pretrial Deadlines* [Doc. No. 76] is **GRANTED** under the conditions stated herein.

**IT IS FURTHER ORDERED** that the **JURY SELECTION/TRIAL** set for TUESDAY, May 11, 2004, at 9:00 a.m., and the **PRETRIAL CONFERENCE** set for TUESDAY, April 6, 2004, at 9:00 a.m. are hereby **VACATED**.

**SO ORDERED** this 17th day of March, 2004, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge

-43-